## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK PRINCE, | ) | |
| | ) | Case No. 15 CV 2952 |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| KRISTON KATO, RICHARD RYBICKI, | ) | |
| PAUL SARPALIUS, Chicago Police Sergeant | ) | |
| W. ROONEY (Star No. 934), UNKNOWN | ) | |
| EMPLOYEES OF THE CITY OF | ) | |
| CHICAGO, and the CITY OF CHICAGO, | ) | |
| Illinois, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT

NOW COMES Plaintiff, PATRICK PRINCE, by his attorneys, LOEVY & LOEVY, and

complaining of Defendants KRISTON KATO, RICHARD RYBICKI, PAUL SARPALIUS,

Chicago Police Sergeant WILLIAM ROONEY (Star No. 934), UNKNOWN EMPLOYEES OF

THE CITY OF CHICAGO, and the CITY OF CHICAGO, Illinois, states as follows:

### INTRODUCTION

1.      Plaintiff Patrick Prince was just a teenager when he was arrested, prosecuted, and

wrongly convicted of the 1991 shooting murder of Edward Porter. Plaintiff had nothing to do

with the murder. He spent more than 25 years in prison for a crime he did not commit.

2.      Prince's wrongful conviction was caused by the egregious misconduct of the

Defendant Chicago Police officers, who fabricated evidence and suppressed evidence in order to

secure Prince's arrest, prosecution, and conviction.

3.      Chief among that fabricated evidence was a false confession, coerced and

concocted by Defendants, which they improperly attributed to Prince. In order to secure Prince's false confession, Defendants used violence, threats, lies, false evidence ploys, and other illegal interrogation tactics during a brutal, nine-hour interrogation.

4.      Defendants' interrogation of Prince was an example of an established practice in the City of Chicago—the false confession capital of the United States—of securing involuntary incriminating statements from innocent criminal suspects through the use of illegal interrogation tactics.

5.      Like other Chicago Police Detectives before him, Defendant Kato beat a great number of suspects into providing false confessions throughout his tenure as a detective. In addition, he used force against witnesses during investigations, in order to secure false statements from them, thereby implicating suspects who he was trying to frame. Despite numerous complaints and allegations against Defendant Kato, the City of Chicago took no action to correct his pattern of misconduct and never disciplined him.

6.      Prince's false confession was the sole piece of evidence used to secure his conviction. Without the confession, Plaintiff never would have been prosecuted, let alone convicted.

7.      Decades after he was convicted, the truth came to light and Cook County Judge Thaddeus Wilson vacated Prince's conviction, concluding that Prince had demonstrated his actual innocence in post-conviction proceedings. Thereafter, the Cook County State's Attorney dropped all charges against Prince, and he was finally released after spending more than half of his life imprisoned for a crime he did not commit.

8.      Though Prince will never get a quarter-century of his life back, he now seeks justice for the harm the Defendants have caused and redress for the loss of liberty and terrible

hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

9. This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

10. This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction. In addition, many if not all of the Defendants reside in this judicial district.

## PARTIES

12. Plaintiff Patrick Prince is a 46 year-old resident of Chicago, Illinois. Prince is a family man, he has a daughter in the Chicago-area, and he enjoys spending time catching up with family after years on account of his wrongful conviction. Plaintiff is currently employed at Dill Pickle Food Co-op in Chicago's Logan Square neighborhood.

13. At all times relevant to the events described in this Complaint, Defendants Kriston Kato, Richard Rybicki, Paul Sarpalius, and other unknown law enforcement officers were police officers in the Chicago Police Department acting under the color of law and within the scope of their employment for the City of Chicago.

14. At all times relevant to the events described in this Complaint, Defendant William Rooney (Star No. 934), and other unknown law enforcement officers supervised the officers in the preceding paragraph. Acting under color of law and within the scope of their employment for

the City of Chicago, they facilitated, condoned, approved, and turned a blind eye to the constitutional violations committed by the officers in the preceding paragraph.

15. Defendant City of Chicago is an Illinois municipal corporation and is and/or was the employer of each of the Defendants. The City of Chicago is liable based on *respondeat superior* for the acts of the Defendants. The City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department.

## FACTS

### The Shooting of Edward Porter

16. On August 28, 1991, Edward Porter was shot and killed on a sidewalk near a busy intersection on the west side of Chicago.

17. A number of people were at the scene of the shooting, and interviewed by CPD officers soon after, including Juanita Reed, Ida Croft, Tommy Watkins, Darnell Davis, Juanita Watson, Donald Watson, James Burns, Gwendolyn Robinson, Ghane Carless, Charles Preston, and others.

18. The foregoing witnesses told the detectives that Mr. Porter was not from the neighborhood, and had arrived near the intersection in his car moments before he was shot.

19. None of these witnesses ever identified Prince as the perpetrator.

20. The reason why no one identified Prince as the perpetrator is because Prince had nothing to do with the shooting of Porter.

### Prince's Name Surfaces

21. On August 29, 1991, the day after the crime, Juanita Reed gave police a description of the person who she had seen running from the scene, and whom police believed was the shooter.

22.     On or about September 7, 1991, more than a week after the murder, Chicago Police officers purportedly received an anonymous tip falsely naming Prince as Porter's killer.

23.     Thereafter, Police showed Reed a photo array of individuals that included Prince.

24.     Reed did not identify Prince as the person she had seen at the scene of the Porter shooting.

**Defendants Arrest and Interrogate Prince**

25.     On October 6, 1991, weeks after the crime occurred, Defendants Kato and Rybicki picked up the investigation.

26.     That day, they searched for Prince, found him at his girlfriend's house, and arrested him without a warrant or probable cause.

27.     Defendants brought Prince to Chicago Police Detective Area Four at Harrison and Kedzie in West Chicago.

28.     From the evening of October 6 through the morning of October 7, 1991, Defendants interrogated Prince.

29.     The custodial interrogation lasted more than 9 hours.

30.     The interrogation was an extreme and alarming abuse of police power, and a wholly illegal effort to secure a confession from Prince, in violation of his constitutional rights, by means of physical and psychological coercion.

31.     Prince was just 19 years old at the time of the interrogation. Defendants knew this, and they knew that Plaintiff's youth rendered him particularly vulnerable to coercive interrogation tactics.

32.     Throughout the course of their interrogation, the Defendants had ample opportunity to observe the consequences that their coercive tactics had on Plaintiff.

33.     Nonetheless, the Defendants took no steps to limit or to adapt their questioning of Plaintiff or to accommodate him in any way.

34.     Instead, they did the opposite: they agreed amongst themselves and acted jointly to overbear Plaintiff's will in order to secure a confession regardless of whether it was true or false.

35.     Defendants did not let Prince sleep as the interrogation progressed. He was handcuffed to a wall virtually the entire night, never given a bed, pillow, or any other humane treatment for having been held in a small interrogation room at a police station overnight.

36.     In addition, Prince was deprived of food during his interrogation.

37.     Prince also was not allowed to use the bathroom during the interrogation.

38.     These factors heightened the impermissibly coercive nature of the interrogation.

39.     Defendants never gave Prince complete, comprehensible, or effective *Miranda* warnings.

40.     Further ensuring that Prince's rights were violated, the Defendants engaged in coercive, deceptive, and diversionary tactics that would have deprived *Miranda* warnings of any force, even if effective warnings had been given. At no point did Plaintiff knowingly or voluntarily waive his right to remain silent.

41.     In fact, the opposite is true: Prince repeatedly invoked his right to remain silent. Despite Prince's invocation, Defendants never ceased their questioning.

42.     The room in which the interrogation took place was locked throughout the interrogation, and Defendants made it clear to Prince that he was not allowed to leave at any point.

43.     The Defendants repeatedly accused Prince of murdering Porter.

6

44.     Over the course of hours, Defendants screamed and yelled at Prince, within inches of his face.

45.     During a break in the interrogation, Defendants placed Prince in lineup. They had Juanita Reed view the lineup. Again, Reed did not select Prince from the lineup.

46.     Defendants nevertheless falsely informed Prince when the interrogation began again shortly thereafter that Prince had been selected in the lineup.

47.     In addition, Defendants falsely told Prince that they had other evidence implicating him in the Porter shooting.

48.     Repeatedly, Defendants threatened Prince with physical violence, telling Prince he needed to confess or that he would be struck and hit.

49.     In addition, Defendants repeatedly used physical violence against Prince. These acts of violence included slapping, punching, and kicking Prince. Among many examples, Defendants slapped Prince in the face after he told Defendants he was not involved in the shooting, they kicked him when he refused to confess after they told him falsely that he had been identified in a lineup, they pulled Prince's hair, and they slammed his head against the wall.

50.     Throughout the interrogation, Prince was in handcuffs. As the interrogation progressed, Defendants tightened the handcuffs, putting Prince in extreme pain as their beating continued.

51.     Despite Prince's consistent denials, Defendants made clear to him that their physical abuse and interrogation would continue until he confessed to killing Porter.

52.     Defendants fed Prince the facts of the crime, and they provided him a narrative that would form the basis of his false confession.

53.     In addition, Defendants made false promises to Prince in order to induce him to

implicate himself falsely in the crime. Among other things, they told Prince that if he confessed he could describe the shooting as an "accident" and that he would face a lesser charge than first-degree murder if he confessed.

54.     At no point did the Defendants heed Plaintiff's requests to stop their physically and psychologically abusive questioning. At no point did the Defendants permit Prince to terminate the questioning. The Defendants' accusations and questioning continued for hours.

55.     In the face of the extreme physical and psychological abuse and coercion described above, Plaintiff broke down and agreed to adopt Defendants' story of the crime as his confession.

56.     After overcoming his will and coercing his cooperation, Defendants took a statement from Plaintiff. They then wrote police reports falsely recounting Plaintiff's arrest, interrogation, and confession.

57.     Despite the untruthful, fabricated police reports, Chicago Police Department Supervisors, including Defendant William Rooney and others up the chain approved the false reports.

58.     Upon information and belief, Defendants also made contemporaneous handwritten notes in "General Progress Reports" (GPRs) or other information in a "street file" concerning the circumstances behind Prince's arrest, interrogation, and confession. Defendants did not, and have not ever, disclosed any GPRs, handwritten notes, their "street file," or other exculpatory evidence to Prince or his criminal defense attorneys.

59.     In committing the misconduct described above, the Defendants made an agreement with one another, and with others currently unknown to Plaintiff, to individually, jointly, and/or in conspiracy secure a false and involuntary confession from Prince and to use

that confession to initiate and perpetuate false criminal charges against Prince.

### The City of Chicago's Policy and Practice of Prosecuting Innocent Persons in Violation of Due Process and Coercing Involuntary Confessions

60.     The Chicago Police Department is responsible by virtue of its official policies for scores of miscarriages of justice like that inflicted upon Plaintiff.

61.     Since the 1980s, at least 70 cases have come to light in which Chicago police officers have fabricated false evidence or have suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they not commit.

62.     These cases include many in which Chicago police officers, including Defendant Kato, used the same tactics that Defendants employed against Plaintiff in this case, including: (1) using physically and psychologically coercive tactics to obtain involuntary and false confessions; (2) fabricating witness statements; (3) concealing exculpatory evidence; (4) manipulating witnesses in order to influence their testimony; and (5) using other tactics to secure the arrest, prosecution and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

63.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching

material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

64.     The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, inter alia, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

65.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

66.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

67.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, inter

alia, *Fields v. City of Chicago*, 10 C 1168 (N.D. Ill.) and *Jones v. City of Chicago*, 87 C 2536 (N.D. Ill.).

68.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Porter murder and investigation at issue here.

69.     In addition, a set of clandestine street files related to Area Give homicide was found in the case of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

70.     Put simply, the policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at the time of the investigation into the Porter murder, including in the Area Four Detective Division.

71.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

72.     Prior to and during the period in which Plaintiff was falsely charged and convicted with the Porter murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

11

73.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

74.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

75.     This includes Defendants in this case. By way of example, Defendant Kato has a long history of engaging in the kind of investigative misconduct that occurred in this case, including coercing confessions, manipulating witnesses, fabricating evidence, and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Defendant Kato has engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced suspects and witnesses and fabricated and concealed evidence, as they did in this case. He engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

76. The City of Chicago and its Police Department also failed in the years prior to Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

a. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

b. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c. The risks of engaging in tunnel vision during investigation.

d. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

77. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

78. The City's failure to train, supervise, and discipline its officers, including Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

79. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs,

despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

80.     The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

### Defendant Kato's History of Using Force and Other Coercive Tactics During Interrogations

81.     As a result of the policies and practices of the Chicago Police Department, described above, Defendant Kato has framed dozens of other innocent men over the span of two decades. Like Plaintiff, these men have all lodged independent accusations of similar misconduct against him.

82.     Defendant Kato has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Kato has engaged in serious investigative misconduct.

83.     Given this extensive history of misconduct and the City of Chicago's failure to meaningful disciplined Defendant Kato and others, it is apparent that Defendant Kato engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his conduct.

84.     Examples of Defendant Kato's misconduct include:

a.  In 1988, Detective Kato slapped and kicked Frederick Seaton, and held him for more than 30 hours until he gave a statement. Though Kato's treatment of Seaton was later declared unlawful, the City of Chicago did nothing in response.

b.  In 1988, Detective Kato beat Gregory Shelton, by slapping and kicking him, holding him overnight and for more than 24 hours; denying him access to food and an attorney; and by telling him that the abuse would only stop if he confessed.

c.  In 1988, Kevin Murry was interrogated for over 24 hours before he confessed, during that period of time he was struck by Defendant Kato and denied access to food, bathroom, and an attorney.

d.  Also in 1988, Detective Kato beat Tony Bey (aka tony Steward), including by putting a gun in Bey's mouth all to get him to falsely confess to a murder, of which he was later acquitted at trial.

e.  In 1988, Detective Kato beat Jerry Butler after illegally arresting him without a warrant and kicked and punched him in the chest, all in an unsuccessful attempt to get him to falsely confess.

f.  In the course of a robbery interrogation, Defendant Kato punched suspect Auby Christian in the chest in 1988.

g.  Keith Washington was physically abused by Detective Kato in 1989, when he was interrogated overnight and for more than 24 hours in which Detective Kato punched him in the chest, choked him, denied him access to the bathroom, and food. As a result, Washington gave a confession.

h.  During a 1989 interrogation, Detective Kato punched and kicked Shawn Hardy in an attempt to get him to confess.

15

i.      In 1989, Detective Kato, and others, held Miller Holston overnight during the course of an interrogation lasting more than 20 hours where they struck and kicked him during the interrogation. The charges against Holston were later dismissed.

j.      Harold Lucas was only 15 when, in 1989, Defendant Kato accused him of murder, interrogated him, punched and slapped him and even wounded his genitals all in an effort to secure a confession.

k.      In 1990, Detective Kato beat Randall and Christopher Haywood by kicking and punching them all in an attempt to get them to provide confessions and other inculpatory statements.

l.      Also in 1990, Detective Kato attempted to obtain a false confession from Daniel Gasca, despite the fact that Gasca was in custody at the time of the crime. To do so, Detective Kato struck him 12-15 times in the head, neck, and chest and held him for more than 15 hours.

m.      In the same investigation, Detective Kato beat Michael Waslewski, by kicking and punching him, until Waslewski made a false confession, including having committed the crime with Gasca even though that was physically impossible.

n.      Willie Smith, who suffered from diabetes, was interrogated for a murder in 1992, during which Detective Kato withheld insulin from Mr. Smith to force him to sign a false confession. After the confession was tossed, the charges against Smith were dropped.

o.      In 1993, Detective Kato punched Aaron Douglas in the face several times in an effort to get him to confess.

p.      Andre Wallace was just 15 when, in 1994, Detective Kato beat him by holding him overnight, squeezing his gentiles, promising him leniency, and obtained a false confession.

q.      In 1996, Esekiel McDaniel was taken to Area 4 in the middle of the night where Detective Kato slapped and threatened him during an overnight interrogation.

r.      Yet another juvenile, Xavier Johnson who was 16 at the time, was interrogated by Detective Kato in 1997, during which Kato kicked and kneed Johnson, and fabricated a confession.

s.      Keith Mitchell was interrogated more than the course of three days in 1997 and physically abused by Detective Kato with elbows, knees, and other threats all in an effort to have him provide a false witness statement to a murder that Mitchell did not actually witness.

t.      James Guyton was arrested and interrogated more than the course of 24 hours, during which he was slapped by Detective Kato, among other things.

u.      In 2002, Detective Kato beat a severely mentally ill man, Carl Chatman, in to providing a false confession, beating him and then trying to hide his name on official documents.

v.      In 2003, Deunsha Woods was held and interrogated over the course of three days, during which Detective Kato repeatedly punched, threatened, and even choked Mr. Woods.

85.      The City of Chicago is well aware of the pattern with respect to Detective Kato. Indeed, the City has received formal complaints to Kato's abuse of Tony Bey (Tony Steward), Jerry Butler, Auby Christian, Keith Washington, Shawn Hardy, Miller Holston, Harold Lucas,

Randall Haywood, Christopher Haywood, Willie Smith, Aaron Douglas, Andre Wallace, Xavier

Johnson, Keith Mitchell, James Guyton, Carl Chatman, Deunsha Woods, and others. Courts have

also concluded that Detective Kato's conduct was unconstitutional. In addition the Illinois Torture

Inquiry Commission found that Kevin Murray had stated a credible claim of torture against Kato.

Nonetheless, exhibiting its deliberate indifference, the City of Chicago has done nothing in

response to this systemic misconduct.

86.     As the examples above demonstrate, the City of Chicago failed to meaningfully

discipline Defendant Kato, or other officers engaged in similar misconduct. The Defendants

engaged in the misconduct set forth in this Complaint because they knew that the City of Chicago

and its Police Department tolerated and condoned such conduct.

**Defendants' Malicious Prosecution of Prince**

87.     As a result of the Defendant's misconduct, Prince was charged and prosecuted for

the first-degree murder of Porter. He was convicted at a bench trial in 1994. The judge sentenced

him to 60 years in prison.

88.     The only evidence used against Prince at trial was his own false confession, which

Defendants had coerced and fabricated.

89.     There was no physical evidence tying Prince to the crime. No fingerprints, DNA,

or any other forensic evidence ever linked Prince to the shooting.

90.     In fact, there was never any probable cause to believe that Prince was involved in

the murder either before or after any of the Defendants' misconduct.

91.     Without Defendants' misconduct described above, Prince would not have been

prosecuted or convicted.

92.     Prince was 19 years old when he was arrested. He spent more than 25 years of his life incarcerated for a crime that he did not commit.

93.     Prince's whole life was turned upside down without any warning. His young adulthood was consumed by the horror of his wrongful imprisonment.

94.     Because of the Defendants misconduct, Prince was taken away from, and missed out on, the lives of his family and friends. He missed out on the ability to share holidays, births, and other life events with loved ones.

95.     Significantly, Prince also missed out on seeing his daughter grow up; seeing the birth of his grandson; and spending time with loved ones who passed away while he was wrongfully convicted, including his mother and other close aunts and uncles.

96.     Plaintiff was robbed of his opportunity to gain an education, to start a family, to engaged in meaningful labor, to develop a career, and to pursue his interests and passions.

97.     During his quarter-century long wrongful imprisonment, Prince was detained in harsh and dangerous conditions in maximum-security prisons.

98.     Plaintiff must now attempt to make a life for himself outside of prison without the benefit of the foundational life experiences which people normally develop throughout their formative teenage and young-adult years.

99.     In addition to the trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Plaintiff has been branded a murderer. He has suffered profound reputational harm as a result.

**Prince's Exoneration**

100.    On April 26, 2017, Cook County Judge Thaddeus Wilson vacated Prince's conviction, concluding that Prince had demonstrated his actual innocence in post-conviction proceedings. On May 16, 2017, the Cook County State's Attorney dropped all charges against Prince.

101.    The same day, Prince was finally released after spending more than half in life imprisoned for a crime he did not commit.

### COUNT I – 42 U.S.C. § 1983
### False Confession
### (Fifth and Fourteenth Amendments)

102.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

103.    In the manner described more fully above, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

104.    In addition, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

105.     In addition, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

106.     Specifically, the Defendants conducted, participated in, encouraged, advised, and ordered and unconstitutional, hours-long interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulted in him making involuntary and false statements implicating himself in the murder of Edward Porter.

107.     In addition, the Defendants refused to provide Plaintiff with his legal guardian and an attorney when he asked to see his legal guardian and when he invoked his right to an attorney while being interrogated.

108.     The false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff.

109.     Those false statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted for and convicted of the Porter murder.

110.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

111.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

112.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT II – 42 U.S.C. § 1983
### Due Process
### (Fourteenth Amendment)

113.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

114.    In the manner described more fully above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

115.    In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence from Plaintiff and from prosecutors (including Defendant Stephenson), among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

116.    The Defendants also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

117.    In addition, the Defendants suppressed evidence that would have demonstrated Plaintiff's innocence.

118.    In addition, based upon information and belief, the Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

119.    The Defendants' misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

120.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

121.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

122.     The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III – 42 U.S.C. § 1983**
**Deprivation of Liberty without Probable Cause**
**(Fourth and Fourteenth Amendments)**

123.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

124.     In the manner described more fully above, the Defendants, individual, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and to cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

125.     In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

126.     These Defendants initiated and continued judicial proceedings against Plaintiff maliciously, resulting in injury.

127.     The judicial proceedings against Plaintiff were terminated in his favor when the Cook County State's Attorney dismissed all charges against him.

128. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

129. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

130. The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT IV – 42 U.S.C. § 1983
### Failure to Intervene

131. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

132. In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

133. As result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. The Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

134. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

135.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

136.     The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT V – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**

137.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

138.     The Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

139.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

140.     In furtherance of this conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

141.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

142.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

143.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT VI – 42 U.S.C. § 1983
### Policy and Practice Claim Against the City of Chicago

144.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

145.    As described more fully herein, the City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

146.    Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

147.    At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects by officers and agents of the Chicago Police Department and the City of Chicago; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses.

148.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

149.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the Chicago Police Department and the City of Chicago falsely confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection.

150.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and

impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

151. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

152. These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

153. T he above widespread practices and customs, so well settled as to constitute *de facto* policies of the City of Chicago, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

154.     As a result of the policies and practices of the City of Chicago and the Chicago Police Department, numerous individuals have been wrongly convicted of crimes that they did not commit.

155.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

156.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### COUNT VII – State Law Claim
### Malicious Prosecution

157.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

158.     In the manner described above, the Defendants, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

159.     In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

160.    The judicial proceedings against Plaintiff were terminated in his favor when the

Cook County State's Attorney dismissed all charges against him.

161.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear

innocence.

162.    As a result of the Defendants' misconduct described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional

pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT VIII – State Law Claim
### Intentional Infliction of Emotional Distress

163.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

164.    The actions, omissions, and conduct of the Defendants, acting as investigators and

as set forth above, were extreme and outrageous.

165.    These actions were rooted in an abuse of power and authority and were

undertaken with the intent to cause, or were in reckless disregard of the probability that their

conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

166.    As a result of the Defendants' misconduct described in this Count, Plaintiff

suffered and continues to suffer emotional distress and other grievous and continuing injuries

and damages set forth above.

### COUNT IX – State Law Claim
### Civil Conspiracy

167.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

168.    As described more fully in the preceding paragraphs, the Defendants, acting in

concert with other known and unknown co-conspirators, reached an agreement among

themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to

accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

169.    The violations of Illinois law described in this complaint, including the Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

170.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

171.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

## COUNT X – State Law Claim
### *Respondeat Superior*

172.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

173.    In committing the acts alleged in the preceding paragraphs, the Defendants were employees of the City of Chicago and the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law.

174.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI – State Law Claim
### Indemnification

175.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

176.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

177.     The Defendants are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described above.

178.     The City is liable to indemnify any compensatory judgment awarded against the Defendants.

WHEREFORE, Plaintiff, PATRICK PRINCE, respectfully requests that this Court enter judgment in his favor and against Defendants KRISTON KATO, RICHARD RYBICKI, PAUL SARPALIUS, Chicago Police Sergeant WILLIAM ROONEY (Star No. 934), UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, and the CITY OF CHICAGO, Illinois, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate. Plaintiff also asks that, upon a finding of liability against the City of Chicago, he be allowed to seek equitable relief to provide a further remedy to the systemic constitutional violations within the City of Chicago.

## JURY DEMAND

Plaintiff, PATRICK PRINCE, hereby demands a trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

**PATRICK PRINCE**

By:    /s/ David B. Owens
       *One of his attorneys*

Arthur Loevy
Jon Loevy
Anand Swaminathan
Steven Art
David B. Owens
LOEVY & LOEVY
311 N. Aberdeen St., 3rd FL
Chicago, IL 60607
(312) 243-5900
david@loevy.com