**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

PATRICK PRINCE,

                    Plaintiff,

      v.

KRISTON KATO, *et al*.

                  Defendants.

Case No. 18 C 2952

Magistrate Judge Sunil R. Harjani

**MEMORANDUM OPINION AND ORDER**

Two discovery motions are before the Court in this action alleging wrongful conviction. Defendants seek to enforce a subpoena for Plaintiff's recorded Illinois Department of Corrections ("IDOC") calls, which may contain relevant information about this case. Plaintiff moves to compel certain communications by defense counsel regarding a new transcript of a motion to suppress hearing in the underlying criminal proceedings that occurred in 1994, and which Plaintiff claims has now been altered to provide a different answer to an important question. Both motions have been fully briefed. For the reasons that follow, Defendants' motion [239] is granted in part and denied without prejudice in part and Plaintiff's motion [242] is granted in part and denied without prejudice in part.

**BACKGROUND**

This Section 1983 action arises from the arrest, prosecution, and conviction of Plaintiff Patrick Prince for the August 28, 1991 murder of Edward Porter. Cook County Judge Thaddeus Wilson vacated Prince's conviction and granted him a new trial on April 26, 2017. On May 16, 2017, the Cook County State's Attorney dropped all charges against Prince. In the present action, Prince claims the individual Area 4 police officer defendants coerced him into falsely confessing, fabricated evidence, and withheld exculpatory evidence. He alleges that this misconduct led to his

wrongful conviction for a murder he did not commit, causing him to spend more than 25 years incarcerated. In addition to his claims against the individual police officer defendants, Prince filed a claim against the City of Chicago under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), asserting the Chicago Police Department had certain policies and customs that caused the individual police officers' constitutional violations. As a result of Prince's conviction, he was in IDOC custody from approximately February 1995 until his release in May 2017.

## DISCUSSION

The parties are actively engaged in discovery. They have exchanged voluminous document productions and have issued and answered written discovery requests. Depositions of the parties and approximately thirty witness depositions have been completed. Approximately five depositions are scheduled for January 2021. The parties have reached an impasse on two discovery issues—Prince's objection to IDOC's production of recorded phone calls made by Prince from 2008 to 2013 and Defendants' attorney work product objection to Prince's discovery requests regarding a new version of the transcript of the motion to suppress hearing held on June 6, 1994. The Court considers each motion in turn below.

**A.     Defendants' Motion to Enforce Subpoena**

Defendants seek an order enforcing its subpoena to IDOC for production of recorded phone calls Prince made from 2008 to 2013. This is Defendants' second motion seeking production of recorded phone calls Prince made while in custody. Defendants' initial motion arose from Prince's refusal to produce 410 phone calls he made from March 2013 to March 2017. Prince produced a phone log provided by IDOC but withheld the recorded phone calls on the bases that the subpoena was overbroad and the recorded phone calls between Prince and his attorney were protected from disclosure by the attorney-client privilege. In deciding Defendants' motion to compel production

of the 2013-2017 phone calls, the Court ordered Prince to: (1) produce all of his phone calls with witness Ozias Israel who had been deposed in this case (at least 117 calls); (2) identify the unidentified individuals to whom 141 calls were made; and (3) produce a privilege log of any alleged privileged conversations Prince had with his attorneys. *See* Doc. 156. Thereafter, Prince produced all 410 recorded IDOC phone calls from March 2013 to March 2017 to Defendants and also provided an index identifying some of the unidentified callers.

Defendants state that they recently became aware that IDOC may have additional recorded phone calls of Prince that were responsive to Defendants' subpoena. At the request of IDOC, Defendants issued a second subpoena to IDOC in approximately June 2020. Upon Defendants' request, IDOC provided a second phone log of Prince's phone calls, listing 569 phone calls from December 20, 2008 to March 26, 2013. According to Defendants, IDOC has indicated it can easily produce the recorded phone calls with no burden to IDOC. After Defendants produced the second phone log of Prince's IDOC calls, Prince objected to Defendants obtaining any of Prince's recorded IDOC phone calls from 2008 to 2013.

In their current motion, Defendants once again ask for the Court's assistance in obtaining Prince's recorded IDOC calls. Defendants contend that during the recorded IDOC calls which have already been produced, Prince discussed his criminal case, his investigation into the murder of Edward Porter, and his experience in prison with nearly every single individual he spoke to on the phone from 2013 to 2017. Given the content of the already produced recorded phone calls, Defendants believe it is very likely that Prince was having similar discussions during the earlier time frame of the additional recorded phone calls. Prince agrees that the Court's prior order requires production of calls he made to individuals he has identified as damages witness (Mary Prince, Ozias Israel, Bruce Prince, Larhonda Prince, Georgia Cox, Lacerise Prince, and James

3

Jones). Doc. 246 at 2, 8. This represents about 156 phone calls of the 569 phone calls now at issue. Prince objects to production of any of the remaining calls, arguing that Defendants are attempting to "embarrass and harass [him]." *Id*. at 2.

As a threshold matter, Defendants argue that Prince waived any further objection to the production of the 2008 to 2013 calls by producing all of his IDOC phone calls from the 2013-2017 period without objection after the Court's October 10, 2019 ruling. To support this assertion, Defendants point out that the subpoena which resulted in the production of the 2013 to 2017 calls sought the production of all of Prince's phone calls that were recorded by IDOC during Prince's incarceration. According to Defendants, "[g]iven this express waiver of any previously asserted objections, any objection to the production of additional materials responsive to Defendants' subpoena is untimely and waived." Doc. 239 at 6.[1]

The Court finds no waiver here. Waiver is the "intentional relinquishment or abandonment of a known right." *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) (en banc); *United States v. Picardi*, 950 F.3d 469, 474 (7th Cir. 2020) ("waiver arises from a knowing and intentional decision."). Prince could not have waived a right to object to recorded phone calls he did not know existed. Prince was unaware of the existence of a second batch of recorded phone calls when he produced the remainder of the first batch of recorded phone calls on November 13, 2019. Until the week of July 27, 2020, Prince did not know that recorded phone calls from 2008-2013 existed and his objections were timely made the next week on August 7, 2020. Docs. 239-9, 239-10. Prince did not know of the existence of the 2008 to 2013 recorded phone calls because IDOC only

---

[1]     In their reply brief, Defendants also insist that Prince waived his current objections by failing to object to Defendants' original subpoena to IDOC within the time frame specified in Rule 45(d)(2)(B). Doc. 251 at 10. This argument is raised for the first time in a reply brief and is waived. *William v. Bd. of Ed. of City of Chicago*, --- F.3d ----, 2020 WL 7218499, at *7 n.30 ("arguments raised for the first time in a reply brief are waived.").

produced recorded phone calls Prince made from March 2013 to March 2017 in response to a subpoena that sought production of all recorded phones during the entire duration of Prince's custody in IDOC. Under these circumstances, Prince could not have reasonably understood that he was waiving a right to object to production of recorded phone calls from December 20, 2008 to March 16, 2013. Defendants' argument that Prince of course knew that he made phone calls between 2008 to 2013 is misplaced. Whether Prince knew he made phone calls between 2008 to 2013 and whether he knew that recorded phone calls between 2008 to 2013 exist and were preserved, however, are two different issues. Waiver of Prince's right to object to the production of recorded phone calls is based on the existence of the recorded phone calls. The fact that Prince was aware that he made phone calls between 2008 to 2013 is irrelevant here. Because Prince did not know that the 2008 to 2013 recorded phone calls exist and could not have known that IDOC had possession of additional recorded phone calls at the time of his first production, Defendants' claim of waiver fails.[2]

Prince further objects to the production of 71 calls made to his attorney Evelyn Baniewicz, a public defender appointed to represent him in post-conviction proceedings, between 2008 to 2013 on the ground that the attorney-client privilege protects those recorded phone calls. Under

---

[2]     The issue of waiver of privilege was expressly addressed when Prince produced the 2013-2017 recorded calls. At that time, Prince stated "[t]his production is not a waiver of the attorney-client, work-product or any other common-law or statutory privilege. To the extent Defendants intend to argue at any point that this production is such a waiver, we ask that you inform us of such and not download the documents." Doc. 239-4. Federal Rule of Evidence 502 governs the scope of attorney-client privilege and work product protection waiver when an intentional disclosure is made in a federal proceeding. Fed. R. Evid. 502(a). Waiver occurs when disclosure is: (1) intentional, (2) the disclosed and undisclosed material concern the same subject matter; and (3) fairness requires considering the material together. *Id*; *Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1026 (7th Cir. 2012). As to Prince's attorney-client privilege objection to the production of his calls made from 2008 to 2013, the Court need not decide whether the undisclosed calls ought to be considered with the disclosed material under Rule 502 because "Defendants are not claiming Plaintiff waived the attorney client or work product privileges by producing the first of Plaintiff's IDOC recorded calls." Doc. 239 at 3 n.1. Rather, as addressed next, "it is Defendants' position that Plaintiff waived any such privilege by communicating with his attorneys on a recorded line when he was in IDOC custody." *Id*.

Rule 45(d)(3)(A), a court must quash or modify a subpoena if it "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A)(iii). "Although the Seventh Circuit has not yet tackled the issue of whether the attorney-client privilege protects recorded prison telephone calls, several courts in this circuit have held that such communications are not privileged because the inmates in question knew their conversations were being recorded and had no reasonable expectation of privacy." *Bishop v. White*, 2020 WL 6149567, at *8 (N.D. Ill. Oct. 20, 2020) (noting "[o]ther courts nationwide are in accord."); *see also Pursley v. City of Rockford*, 2020 WL 1433827, at *5 (March 24, 2020); *Simon v. Northwestern University*, 2017 WL 66818, at *4-6 (N.D. Ill. Jan. 6, 2017). "It cannot be that [an inmate] intended his attorney phone calls to be confidential if he knew his phone calls with his attorneys were recorded." *Pursley*, 2020 WL 1433827, at *5.

Here, Prince does not dispute that he knew his phone calls with Baniewicz were being recorded. Prince relies on dicta in *Simon* which suggests an "impediment to his access to unrecorded calls" along with his intention for his conversations to be confidential might preserve his attorney-client privilege, but Prince does not claim that there was any actual impediment to his access to unrecorded calls. *Pursley*, 2020 WL 1433827, at *5; *see* Doc. 246 at 12-13. Prince claims that the mere existence of 71 calls between him and his appointed post-conviction counsel suggests that he "did not have another viable means of interacting with his counsel." Doc. 246 at 13. The Court rejects this contention. Prince's argument says nothing about whether he was in fact aware he had the option to arrange an unrecorded call with his post-conviction counsel, whether he had access to unrecorded phone calls, and whether he made any unrecorded calls with his post-conviction counsel. Thus, Prince has waived any claim of privilege by knowingly

communicating with his attorney Evelyn Baniewicz on a recorded line. *Bishop*, 2020 WL 6149567, at *9; *Pursley*, 2020 WL 1433827, at *5; *Simon*, 2017 WL 66818, at *4-6.

Prince asserts that he did not waive the attorney-client privilege because IDOC "improperly" recorded calls that it knew or should have known were made to his attorney. Prince states that IDOC requires inmates to identify the type of relationship between the inmate and the person being called for each call made. From this, Prince argues that when he called "his attorney, and IDOC knew he was calling his attorney, it should not have recorded the all." Doc. 246 at 13. Prince cites no authority for that proposition. Contrary to Prince's naked assertion, "IDOC's website unequivocally states that unless a call is arranged as a private attorney call, all calls are recorded." *Simon*, 2017 WL 66818, at *5. The responsibility for arranging unrecorded attorney calls rest with the inmate and the attorney. With regard to inmate phone services, IDOC's website states: "All offender telephone calls are subject to monitoring and recording at any time by Departmental staff, unless prior special arrangements have been made to make or receive an unmonitored attorney call. All requests for unmonitored attorney calls must be processed by a member of the IDOC legal staff." Illinois Department of Corrections, Inmate Phone Services, https://www2.illinois.gov/idoc/communityresources/Pages/InmatePhoneServices.aspx (last visited Dec. 23, 2020). Because Prince waived any claim of attorney-client privilege with respect to the 71 calls to Baniewicz on a recorded line and Baniewicz is a witness in this case who has been deposed, Prince is ordered to produce those 71 calls. *See* Doc. 156.

This leave 342 calls that remain subject to Defendants' motion. Defendants state that Prince made 72 of those phone calls to three aunts (Bettie Spearman, Elaine Warfield, Linda Prince), a cousin (Lakeisha Hunter), and two friends (Regina Wilson and Tangle Johnson). The rest of the approximately 270 calls were made by Prince to individuals who Defendants have not

been able to identify.  As to these unidentified individuals, Prince contends that Defendants are on a "fishing expedition" in an attempt "to burden, harass, and embarrass [him] by prying into personal phone calls from over a decade ago" and that Defendants should be required to issue a more focused and narrowed request. Doc. 246 at 9.  Prince claims that the phone calls to the unidentified individuals are "with people who have nothing to do with this case whatsoever, and who are not witnesses here." *Id*. at 8.

Prince's relevance challenge phone calls to unidentified individuals is flawed for two reasons.  First, without identifying the unidentified persons and the content of the communications, Prince's representation that the calls are irrelevant and not with witnesses in this case is wholly unsupported by any evidence or fact.  Second, Prince ignores the fact that while Defendants are not able to identify the individuals Prince called while in custody, Prince made the calls and he is certainly able to do so.  As the Court ruled before, prior to addressing the relevance of calls to unidentified individuals, Prince is obligated to identify the individuals on these 270 phone calls and produce a spreadsheet to Defendants. *See* Doc. 156.  "The identification of these individuals will help establish the purported relevancy basis for the production (or Plaintiff's objection), as to who these individuals are and why they may have relevant information." *Id*.  For example, after Prince identified the previously unidentified callers per this Court's prior order, Defendants learned Prince had placed several phone calls to one of his identified damages witnesses, James Jones. Doc. 251 at 4.  Accordingly, Prince shall identify the unidentified callers including any three-way calls (addressed below) on the 270 calls in a spreadsheet.  Like a privilege log, the spreadsheet shall also describe the nature of the communications in sufficient detail to enable Defendants to assess Prince's claim of irrelevance.  This includes the identification of communications about Prince's criminal case, his investigation into the murder of Edward Porter,

and his experience in prison. If it has not already done so, IDOC shall produce the 569 phone calls from December 20, 2013 to March 26, 2013 to Prince.

There is one additional matter to be addressed concerning the relevance of the 72 phone calls to Prince's three aunts, a cousin, and two friends. As noted in Defendants' briefing, almost ten percent (approximately 40 of 410 calls) of the calls made by Prince from March 2013 to March 2017 involved three-way calls, meaning that Prince spoke to a third party who was added or joined to the call and who was not the caller identified on the IDOC phone log. Doc. 239 at 3. In order to more accurately assess relevance, Prince's spreadsheet to be provided to Defendants shall include the identification of any third-party callers who participated in the 72 calls to Prince's three aunts, a cousin, and two friends as well as the nature of the communications.

Prince shall produce the required spreadsheet by January 20, 2021. Once the spreadsheet is provided to Defendants, the parties are to meet and confer by telephone and seek to resolve any disagreements over production of the remaining 342 phone calls. The parties are also to discuss whether the Confidentiality Order in this case can address Prince's privacy concerns. The parties shall report the results of their meet and confer efforts in the joint status report which is due by January 29, 2021. *See* Doc. 249. Defendants' Motion to Enforce Defendants' Subpoena for Plaintiff's Recorded IDOC Phone Calls [239] is therefore granted in part as to the 227 calls made to witnesses in this case which includes the 71 calls to Prince's attorney Evelyn Baniewicz and denied without prejudice in part to as the remaining 342 calls pending Defendants' production of the required spreadsheet and the parties' further meet and confer efforts.

**B.    Prince's Motion to Compel**

The second pending discovery motion concerns Prince's request for Defendants' and their counsel's communications with Cook County Court Reporters and Judge Dominica Stephenson

regarding a new version of the transcript of the June 6, 1994 motion to suppress hearing in the underlying criminal case in this matter. The Court first sets forth the factual background relevant to the pending motion to compel.

On October 6, 1991, Prince was arrested at his girlfriend's house. Prince alleges that "[f]rom the evening of October 6 to the morning of October 7, Defendants conduced a brutal interrogation of [him], which lasted more than nine hours." Doc. 242 at 2. Prince further alleges that as a result of the violent interrogation by Defendants, he "broke down and adopted Defendants' fabricated account of the Porter murder." *Id*. at 3. Dominica Stephenson was then the Assistant State's Attorney ("ASA") assigned to the Porter case from the Cook County State's Attorney's Office. On October 7, 1991, ASA Stephenson came to the police station and prepared a handwritten statement which sets forth Prince's alleged false confession.

In the criminal case, Prince moved to suppress the handwritten statement claiming abuse. On June 6, 1994, ASA Stephenson testified at Prince's motion to suppress hearing. The Official Court Reporter at that hearing was Ann Hieber, and her transcript of that hearing became part of the official record of proceedings following Prince's criminal conviction. Doc. 242-2 at 36-104 (hereinafter referred to as the "Hieber Transcript"). When asked about her interactions with Prince at the police station, the Hieber transcript reflects that Stephenson testified on direct examination in part as follows:

> Q.     What, if anything, happened while the two of you were in that room alone together?
>
> A.     At that time I asked Patrick Prince if he had been threatened in any way to give the statement to me and he said no. I asked him how he was treated by the police and he told me he was treated fine, well by the police. I asked him if he had anything to eat and he told me he had an Egg McMuffin. I asked him if he had anything to drink. He told me he had been given coffee. I asked him if he was allowed to smoke and go to the rest room and he said yes to both of those questions. I asked him if he was promised anything in exchange for giving the statement to

me and he said no.  I asked him if he was coerced in any way to give the statement to me.  He said no.  I believe I asked him, asked him at that time if he was under the influence of any drugs or alcohol and he said no.

*Id*. at 48:17-49:6.  The Hieber Transcript reflects that Stephenson also testified:

> *Q.    Did the defendant Patrick Prince ever tell you that he had been told he had been identified in the lineup?*
>
> *A.    Yes.*
>
> Q.    Did you yourself ever tell him that he had been identified in lineup?
>
> A.    No.
>
> Q.    Did you ever hear any police officer tell Patrick Prince that he had been identified in a lineup?
>
> A.    No.
>
> *Q.    Did Patrick Prince ever tell you at any time that he had been physically abused by being struck in the face, body, and legs?*
>
> *A.    Yes.*
>
> Q.    Did he ever complain to you of any injury whatsoever?
>
> A.    No.

*Id*. at 58:2-18 (emphasis added).  At Prince's criminal trial in August 1994, Stephenson testified

in part on direct:

> Q.    And while you were alone with Patrick Prince, did you ask him how he was treated by the detectives?
>
> A.    Yes.
>
> Q.    And can you tell us how he responded?
>
> A.    Yes.  That's the first question I asked him when were alone, how he was treated by the police and he told me he was treated well by the police.
>
> Q.    Did he ever tell you that he was threatened or hit by Detective Kato?
>
> A.    No.

Doc. 47-6 at 6:15-7:2.

Almost 23 years later on April 7, 2017, then-Judge Stephenson testified in Prince's post-conviction hearing before Judge Thaddeus Wilson. Stephenson was again asked about her interactions with Prince at the police station on October 7, 1991 in part as follows:

Q. And, in fact, Mr. Prince told you that he had been identified in a lineup; right?

A. I believe so.

* * *

Q. Now, I believe earlier on direct examination you said that Mr. Prince never informed you whether or not he had been struck or harmed in any way; correct?

A. Yes.

Q. Didn't you actually testify that he had told you that?

A. No.

* * *

Q. On June 6th of 1994, were you asked these questions and did you give these answers:

"Did Patrick Prince ever tell you at any time that he had been physically abused by being struck in the face, body, and legs?
Answer:        Yes."

A. I don't believe that was my answer.

Q. So you believe the transcript is wrong?

A. I do. And if it's not wrong, then I misheard the question because he never told me that and I don't believe that's my answer.

Doc. 242-3 at 38:11-13, 48:11-17, 49:15-50:1. Judge Wilson raised the issue of the Hieber Transcript reflecting that Stephenson said Prince complained of abuse with Prince's counsel:

12

THE COURT: And so then my question is, wasn't that litigated or was it not even argued in terms of the argument of counsel that she said he actually – it seemed something kind of odd to just kind of gloss over. She indicated that she believed she did not say that, that the transcript was inaccurate. And if it was accurate, she misunderstood the question. But it seems kind of odd that such a statement would have been kind of glossed over.

MR. OWENS: I agree. I wasn't there. I don't have the full text for it. I saw it in the transcript. I asked the Judge [Stephenson] about it. I don't know what way that would play if there was an explanation or if there were a new trial or something like that. That's what the transcript is. The evidence is what we have here. And I do want to focus on that.

Doc. 247-4 at 4:3-18. It does not appear that Prince's counsel or the CCSAO made an effort to resolve the apparent discrepancy before Prince's conviction was vacated and the CCSAO chose not to retry the case.

In February 2020, during discovery in this case, Defendants produced a new version of the transcript of ASA Stephenson's motion to suppress hearing testimony. Doc. 242-5. The new transcript of the June 6, 1994 hearing contains a certification signed by Renay Patterson Sebanc, a court reporter, and dated February 18, 2020, which states:

I, RENAY PATTERSON-SEBANC, an Official Court Reporter for the Circuit Court of Cook County, Municipal Department-Criminal Division, do hereby certify that I note-read the stenotype notes of ANN HIEBER, to the best of my ability of the proceedings had at the aforementioned cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the proceedings had before the HONORABLE SHELVIN SINGER, judge of said court.

*Id*. at 74:6-15 (hereinafter the "Patterson-Sebanc Transcript"). The Patterson-Sebanc Transcript contains a number of changes to the Hieber Transcript. *See* Doc. 242-6. Among other changes, the Patterson-Sebanc Transcript reflects that Stephenson testified as follows at the motion to suppress hearing:

*Q. Did the defendant, Patrick Prince, ever tell you that he had been told he had been identified in the lineup?*

A.     *No.*

Q.     Did you yourself ever tell him that he had been identified in a lineup?

A.     No.

Q.     Did you ever hear any police officer tell him that he had been identified in a lineup?

A.     No.

Q.     *Did Patrick Prince ever tell you at any time that he had been physically abused by being struck in the face, body, and legs?*

A.     *No.*

Q.     Did you ever -- he ever complain to you of any injury whatsoever?

A.     Ano.

Doc. 242-5 at 25:17-26:6 (emphasis added).

As part of his efforts to investigate how the changes to the Hieber Transcript came about, Prince asked Defendants to provide documents and supplemental interrogatory responses setting forth Defendants' and their counsel's communications, oral or written, with court reporters and any other third-party relating to the Patterson-Sebanc Transcript. Defendants construed Prince's request regarding the Patterson-Sebanc Transcript as a supplemental request to produce documents and objected to the extent it seeks information protected by the attorney-client and work product privileges. Doc. 247-8 at 2. In response, Defendants advised that they have had no communication, written or oral, with Judge Stephenson. Defense counsel additionally spoke with Prince's counsel and orally described his office's contact with the official court reporter's office:

> Counsel stated that his staff called the official court reporters' office at 26th street to order the transcript, and that there was a second, follow-up call to check on the status of the order, at which point the official court reporters' office said that it had found the stenographic notes and would be typing up the transcript. Counsel then stated that the court reporter sent the transcript to the City, and the City responded with a letter and paid for the transcript.

Doc. 247-8 at 3. Without waiving their objections, Defendants produced five pages of documents, which pertain to their payment of the court reporter's invoice for the Patterson-Sebanc Transcript. Defendants also stated that they objected to the extent Prince sought "any further information, which is clearly work product." *Id.*

Prince also served a subpoena for documents on Judge Stephenson asking for documents relating to this case, including communications with Defendants and their counsel regarding the case. Counsel for Judge Stephenson produced documents relating to the case, represented that Judge Stephenson has had no direct communications with Defendants or their counsel regarding the case, and took the position that her counsel's own communications with Defendants and their counsel are work product.

Prince now moves to compel Defendants to produce documents in their possession and answer interrogatories regarding the Patterson-Sebanc Transcript. In his motion, Prince claims that "Defendants are attempting to change the facts of what happened during state-court proceedings decades ago." Doc. 242 at 7. Prince wants to know why and how the Patterson-Sebanc Transcript came to exist, who was involved in the process, and what Defendants have said to third-party witnesses (including Judge Stephenson) about the Hieber Transcript and the Patterson-Sebanc Transcript. Given the importance of the issue, Plaintiff demands a "full accounting" of the "altered transcript." *Id.* at 2.

In response, Defendants say that they, "[l]ike Judge Wilson and Prince's counsel in 2017, . . . thought it odd that Stephenson would have testified Prince complained of abuse (as the Hieber Transcript reflects), yet there would be no further reference to that answer, following-up questioning, or argument on such a seemingly important point." Doc. 247 at 8. Defendants believe the "mostly likely explanation is that Stephenson actually testified that Prince did *not* complain of

abuse." *Id*. at 7-8. Defendants explain that the "simple truth is defense counsel's office ordered a transcript of proceedings from the Official Court Reporter, the transcript was typed-up by the Official Court Reports, and it was produced." *Id*. at 2. Defendants propose an inspection of the original notes from the original stenographer with all parties present under the supervision of this Court. *Id*

Under Rule 26 of the Federal Rules of Civil Procedure, "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Defendants state that they have produced all responsive, non-privileged written communications and that the only documents being withheld are defense counsel's written communications with Stephenson's attorney regarding the Patterson-Sebanc Transcript. Defendants contend that those attorney-to-attorney communications are work product.

"The attorney work product privilege establishes a zone of privacy in which lawyers can analyze and prepare their client's case free from scrutiny or interference by an adversary." *Miller UK Ltd. v. Caterpillar*, 17 F.Supp.3d 711, 734 (N.D. Ill. 2014). Rule 26(b)(3)(A) codifies the work product doctrine and protects from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A).[3] Material that constitutes fact work product may be discovered if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *Id*; *see also* Fed. R. Civ. P. 26(b)(3)(B) (in ordering discovery of relevant work product materials once a showing of

---

[3]     When work product protection is sought as to oral statements, courts apply the principles articulated in *Hickman v. Taylor*, 329 U.S. 494, 512 (1947). *Beverly v. Watson*, 2015 WL 5117043, at *2 n.1 (N.D. Ill. Aug. 28, 2015).

substantial need and undue hardship has been made, the court "must protect against disclosure of the mental impression, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."). "This burden is difficult to meet and is satisfied only in 'rare situations, such as those involving witness unavailability.'" *Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 478 (N.D. Ill. 2002).

In support of his motion to compel, Prince raises three arguments: (1) Defendants must provide a privilege log of their communications relating to the Patterson-Sebanc Transcript; (2) Defendants' communications with third-parties regarding the Patterson-Sebanc Transcript are not work product; and (3) even if Defendants' communications with third-parties regarding the Patterson-Sebanc Transcript are work product, they must be disclosed because Prince has a substantial need for them. After carefully considering Prince's arguments, the Court finds that he is entitled to a privilege log of defense counsel's written communications with Stephenson's attorney regarding the Patterson-Sebanc Transcript; that disclosure to a third-party such as Stephenson does not automatically waive work-product protection; and that Prince has not shown he is unable to obtain the desired factual information he seeks from other sources.

First, Prince seeks a privilege log for all communications Defendants and their counsel had with third parties regarding the Patterson-Sebanc Transcript that are withheld as work product. "[T]he burden rests on the party asserting the work-product doctrine to establish the necessary elements." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 335 F.R.D. 510, 520 (N. D. Ill. 2020). Rule 26(b)(5)(A) requires that when a party "withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing

17

information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). In order to satisfy Rule 26(b)(5)(A), "this is generally done through a privilege log." *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 218 (2013).

The Court understands from the briefing that two categories of communications are subject to the claim of attorney work product: (1) defense counsel's written communications with Stephenson's attorney regarding the Patterson-Sebanc Transcript and (2) defense counsel's oral communications with Stephenson's attorney regarding the Patterson-Sebanc Transcript. Defendants acknowledge that Prince asked for a privilege log of defense counsel's communications with Stephenson's lawyer but contend they should not be required to produce one unless Prince reciprocates by providing a log of his attorney's communications with attorneys for third party witnesses since this litigation was filed, such as the public defender, lawyers for Rule 404(b) witnesses, or lawyers for any third party witness.

To begin, Prince is entitled to discovery regarding the circumstances surrounding the creation of the Patterson-Sebanc Transcript. Prince argues that the changed testimony is relevant to the issue of "[w]hether [Prince] was physically and unlawfully abused by Defendant Kato . . . [which] is a core dispute in this case." Doc. 242 at 13. Defendants do not argue otherwise. Further, it is common practice in litigation for parties to agree that they are not required to keep a privilege log of documents created by counsel, including counsel's communications, or at the direction of counsel, after the litigation began because those documents are often privileged and voluminous. However, given the unique circumstances presented in this case, the Court concludes that a targeted privilege log limited to written communications between defense counsel and Stephenson's counsel relating to the Patterson-Sebanc Transcript is appropriate. The Court is not implying any misconduct by Defendants or their counsel. A privilege log will, however, provide

Defendants an opportunity to meet their burden of explaining why the disputed documents are covered by the work-product doctrine. A privilege log will also allow Prince to adequately assess the assertion of privilege and either confirm the privilege assertions or challenge the privilege assertions if he believes Defendants improperly withheld documents.

The Court declines to a require a "reciprocal" privilege log of all of the Loevy law firm's written correspondence with attorneys for third party witnesses. First, Defendants never objected to omitting post-filing correspondence and materials created by counsel from privilege logs until the current dispute. Second, as Defendants recognize, it would be an "impractical and costly" exercise for counsel to provide a running log of all of their written communications with third party counsel during litigation. Doc. 247 at 14. Third, Prince has not asserted attorney work product to protect his counsel's communications with attorneys for third parties in response to a specific discovery request from Defendants. Fourth, Defendants never moved to compel production of a privilege log of Prince's counsel's communications with attorneys for third party witnesses. Fifth, the Court finds no justification for requiring Prince's counsel to provide a log of all of their communications with third party counsel during litigation and Defendants offer none. Because the Court does not see any benefit or necessity in requiring the Loevy law firm to create a privilege of its communications with attorneys for third party witnesses, no privilege log is required.

As to oral communications, Defendants states that to the extent Prince is suggesting that defense counsel identify their oral communications with the attorney for Judge Stephenson, they object that "that would be patently inappropriate." Doc. 247 at 15 n.6. Prince's reply brief does not specifically address this point. At this stage of the proceedings on this issue and on the limited record provided, the Court finds that Defendants need not provide a privilege log for oral

communications between defense counsel and counsel for Judge Stephenson for which they are asserting work product protection. *Doyle v. City of Chicago*, 943 F. Supp. 2d 815, 826–27 (N.D. Ill. 2013) (recognizing "that oral communications arguably fall under the Rule 26 privilege log requirement" but declining to require Defendants to provide a privilege log for oral communications between defense counsel and their clients when responding to interrogatories given the logistical difficulties with requiring a privilege log for verbal communications).[4] Defendants production of a privilege log as to written communications will be the initial step in their asserting privilege. To the extent that a privilege log of written communications fails to provide sufficient information regarding the communications between defense counsel and Stephenson's attorney for Prince to determine whether work product protection applies to the listed communications or whether he wants to challenge those assertions, further action may be appropriate.

Prince's second argument is that there "can be no doubt" that communications had between counsel for the Defendants and counsel for a third-party such as Stephenson are "simply not work product." Doc. 242 at 11. This is not necessarily so since waiver of work product protection occurs when the disclosure of work product "substantially increase[s] the opportunities for potential adversaries to obtain the information." *Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1025 (7th Cir. 2012); *Miller UK Ltd.*, 17 F.Supp.3d. at 736 ("Because the work-product doctrine serves to protect an attorney's work product from falling into the hands of an adversary, a disclosure to a third party does not automatically waive work-product protection."). "What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances." *United States*

---

[4]     If there are oral communications between defense counsel and attorneys for other third parties relating to the Patterson-Sebanc Transcript for which defense counsel are asserting work product protection, they should inform Prince's counsel.

*v. Nobles,* 422 U.S. 225, 239 n.14 (1975). The relevant "question is whether the particular disclosure was of such a nature as to enable an adversary to gain access to the information." *Blanchard v. EdgeMark Financial Corp.*, 192 F.R.D. 233, 237 (N.D. Ill. 2000). As the party asserting waiver, Prince has the burden to show that a waiver of work product protection occurred. *Miller UK Ltd.*, 17 F.Supp.3d at 737.

Defendants assert that they had no reason to expect that defense counsel's communications with Stephenson's attorney would be subject to disclosure. It is significant that Judge Stephenson's attorney likewise asserted work product in response to Prince's subpoena for his records. Prince points out that Defendants have not relied on a confidentiality agreement between defense counsel and Stephenson's counsel that would support a finding of non-waiver. "While a confidentiality agreement may provide that basis, its absence may not be fatal to a finding of non-waiver. Phrased differently, a confidentiality agreement may be sufficient but not a necessary element of a finding of nonwaiver." *Miller UK Ltd*., 17 F.Supp.3d at 738. All this being said, the Court need not resolve the waiver question today. Because there is no privilege log at this time, a decision as to whether Defendants meet their initial burden to establish the necessary factual basis for their assertion of the work-product doctrine and whether Prince can establish that a disclosure to Stephenson substantially increased the possibility that he would learn the information would be premature. Accordingly, Prince's motion to compel defense counsel's communications with Stephenson's attorney regarding the Patterson-Sebanc Transcript on the basis of waiver is denied without prejudice.

Lastly, for any communications between counsel for the Defendants and counsel for Judge Stephenson that are protected as attorney work product, Prince argues that there is a substantial need for the disclosure of those documents in order to: (1) "determine precisely, if, to what extent,

and the time of, any communications between Defendants and third parties as it relates to the altered transcript" and (2) to assess the veracity of the testimony of Judge Stephenson. Doc. 242 at 13. Furthermore, Prince contends that there is no way for him to otherwise obtain this information because Judge Stephenson's communications with her attorney are protected by the attorney-client privilege.

Whether Prince can show a substantial need for the withheld materials to prepare his case bears upon the discoverable information which Prince can otherwise obtain without undue hardship. *See* Fed. R. Civ. P. 26(b)(3)(A)(ii). Based on the record before the Court, Prince has not made any showing that he is unable to obtain substantially equivalent factual information through other means. It is thus unclear whether other means exist to obtain the information Prince needs to prepare his case. For example, it is possible that Prince will be able to obtain the factual information he seeks directly from Stephenson and an inspection of the original notes of the stenographer. There may well be others who are also sources of the information sought. Prince's counsel has talked to Cook County court reporting personnel and he may seek the depositions of the court reporters, if necessary. Also, deposing Stephenson and inspecting the stenographer's notes is not an undue hardship and may lead to the substantial equivalent of the information in question. The Court is open to revisiting the issue if the substantial equivalent of the withheld factual information is unavailable by other means. Accordingly, Prince may renew his request to discover any work product protected written communications between defense counsel and Stephenson's attorney regarding the Patterson-Sebanc Transcript if it becomes necessary after his completion of additional discovery.

For the foregoing reasons, Plaintiff's Motion to Compel [242] is granted to the extent it seeks production of a privilege log of all withheld written communications between defense

counsel and Stephenson's attorney regarding the Patterson-Sebanc Transcript but denied without prejudice as to the remainder of the Motion. Within 14 days, Defendants shall produce a privilege log which includes sufficient information to assess their work product claims. *See RBS Citizens, N.A.*, 291 F.R.D. at 218. Further, the parties should meet and confer regarding a protocol for the parties to review the original stenographer's notes of the June 6, 1994 hearing. If the parties are unable to reach an agreement as to a protocol, they may seek the Court's assistance by contacting the Courtroom Deputy and setting a telephone conference call. If after complying with the directives as to the privilege log and the completion of additional discovery, Prince disputes any of defense counsel's work product assertions, counsel shall meet and confer in good faith in an attempt to resolve the dispute. Absent a resolution, Prince may re-new his motion to compel to raise the dispute with the Court. Finally, Defendants request their attorney's fees and costs incurred in connection with preparing their response brief. They cite no authority for their request, and their request for attorney's fees is denied.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Enforce Defendants' Subpoena for Plaintiff's Recorded IDOC Phone Calls [239] is granted in part and denied without prejudice in part and Plaintiff's Motion to Compel Discovery Responses Regarding Defendants' Communications with Cook County Court Reporters and Judge Stephenson [242] is granted in part and denied without prejudice in part.

**SO ORDERED.**

Dated:  December 28, 2020

_____
Sunil R. Harjani
United States Magistrate Judge